V. E. OEHLER, Trustee, Respondent, v. PHOENIX INSURANCE COMPANY, of Hartford, Connecticut, Appellant.

St. Louis Court of Appeals, September 30, 1911.

1. APPELLATE PRACTICE: Review: Credibility of Witnesses: Trial Practice. The credibility of witnesses and the weight and value to be accorded their testimony are matters for the consideration of the jury.

2. **FIRE INSURANCE: Action on Policy: Sufficiency of Evidence.**
In an action on a fire insurance policy, defended on the ground
insured had been guilty of fraud in removing a part of the
insured goods from his store before the fire, a verdict for
plaintiff *held* sustained by the evidence.

3. **——: ——: Breach of Covenant for Keeping Books: Waiver.**
As a general proposition, the taking of proofs of loss by a
fire insurance company and its promise to pay operate as a
waiver of a breach of covenant contained in the policy, per-
taining to the keeping of accurate books and inventories by
insured; but such acts do not operate as a waiver if the ad-
juster, at the time of accepting the proofs and promising to
pay, had no knowledge of the facts concerning the breach of
covenant, since waiver is the intentional abandonment of a
known right.

4. **WAIVER: What Constitutes.** A "waiver" is the intentional
abandonment of a known right, and exists only when the party
claimed to have made it was possessed of knowledge in respect
of the matter about which the waiver is asserted, and acted
advisedly.

5. **FIRE INSURANCE: Action on Policy: Breach of Covenant for
Keeping Books: Waiver: Instructions.** In an action on a fire
insurance policy, an instruction that, if insured did not take
and keep such an inventory or set of books as the policy
required, yet if defendant's adjuster met insured to examine
the facts as to the fire, and went over with him the facts as
to the loss suffered, if any, and insured then gave the ad-
juster such books, bills· and inventories as he in fact did keep,
relating to the stock of goods and his loss, if any, and the
adjuster did not object to the same, but adjusted the loss, then
the jury might find that the insurer waived its right to declare
the policy forfeited for failure to keep an inventory and proper
books, was not objectionable as assuming that the adjuster and
insured "went over all the facts" pertaining to the loss, but
should be construed as submitting that question to the jury.

6. **——: ——: ——: ——: ——.** Where, in an action
on a fire insurance policy, defendant denied liability because
of the breach of a covenant to keep accurate books and in-
ventories, on the theory that the books did not show an alleged
removal from insured's store, before the fire, of certain of the
goods insured, and there was no proof that defendant's adjuster,
at the time he adjusted the loss, had any knowledge concerning
such alleged removal, an instruction that, if the jury found
that the adjuster accepted such books as insured had and on
them adjusted the loss without objection, they might find that

the insurer had waived its right to declare the policy void for breach of the covenant to keep accurate books and inventories, was erroneous.

7. ——: ——: ——: ——: ——: **Harmless Error.** But, in view of the fact that the jury were charged by another instruction that there was no waiver if goods were actually removed from insured's store before the fire, and that the jury found, under all the instructions, that none of such goods were removed, the error in giving said instruction concerning waiver by adjusting the loss was not prejudicial.

8. **INSTRUCTIONS: Not Based on Evidence.** It is error to give an instruction submitting an issue to the jury, concerning which there is no proof.

9. ——: **Contrued Together.** All the instructions given should be read and interpreted together.

10. **APPELLATE PRACTICE: Harmless Error.** Section 2082, Revised Statutes 1909 commands that no judgment shall be reversed unless the court believes error intervened at the trial, materially affecting the merits, against appellant.

Appeal from Lincoln Circuit Court.—*Hon. James D. Barnett*, Judge.

AFFIRMED.

*O'Neill Ryan* and *R. L. Sutton* for appellant; *Ryan & Thompson* of counsel.

The court erred in giving instruction numbered one asked by plaintiff because: (a) It was vague, misleading and confusing. Sapp v. Hunter, 134 Mo. App. 685; Harrison v. Franklin, 126 Mo. App. 366; Trustees, etc., v. Hoffman, 95 Mo. App. 488. (b) It singled out one defense, to-wit, the failure to keep proper books and inventory under the "iron safe" clause, and directed the jury that if they found certain facts therein set forth that then the jury, upon that issue, might find for plaintiff, ignoring the other—the fraud—defense. Rudd v. Fire Ins. Co., 120 Mo. App.

1; Imboden v. Trust Co., 111 Mo. App. 220; Ormsby v. Ins. Co., 98 Mo. App. 371; Swink v. Anthony, 96 Mo. App. 420; Holladay, etc., Co. v. Moss Tie Co., 87 Mo. App. 167. (c) It singled out certain facts and told the jury that if they found these facts the company waived its right to forfeit the policy "for those reasons." James v. Insurance Co., 135 Mo. App. 247; Landrum v. Railroad, 132 Mo. App. 717; Gage v. Mears, 107 Mo. App. 140. (d) It was in substance an instruction to the jury that if they found against defendant on one of the defenses interposed they could return a verdict for plaintiff, ignoring other defenses made and supported by proof. Authorities, supra, (b). (e) It was argumentative and a comment on evidence. Smith v. Woodmen, 179 Mo. 119; James v. Insurance Co., 135 Mo. App. 247; Ford v. Gray, 131 Mo. App. 240; Gage v. Mears, 107 Mo. App. 140; Swink v. Anthony, 96 Mo. App. 420. (f) It assumed a strongly contradicted fact, namely, that Caraway, at Dallas, "went over the facts of his loss" with Slaton. Crow v. Railroad, 212 Mo. 589; Railroad v. Stewart, 201 Mo. 491. (g) It squarely conflicted with defendant's instruction No. 5.

*R. H. Norton, Avery, Dudley, Young & Killiam, Barclay, Fauntleroy & Cullen* for respondent.

(1) Respondent's instruction No. 1 is not subject to the objection that it leaves out of consideration the defense of fraud as it is limited to one issue, waiver of books and inventory. And defendant's instructions set forth its defense just as requested by it. All the facts and issues proper to be submitted need not be combined in one instruction. They may be included in a series of instructions. It is sufficient if the instructions, as a whole, present the issues fairly to the jury. Minter v. Bradstreet Co., 174 Mo. 444; Russell v. State Ins. Co., 55 Mo. 585; Fullerton v. Railroad, 84 Mo. App. 498; Muehlhausen v. Railroad, 91 Mo.

332; Sackewitz v. Am. Biscuit Mfg. Co., 78 Mo. App. 144; Fletcher v. Mfg. Co., 35 Mo. App. 321. (2) Instructions may assume a fact conceded or established or about which there is or can be no reasonable controversy. "The rule is that the assumption in an instruction of an issuable fact conceded by the other party is not erroneous." Sweeney v. Cable Ry. Co., 150 Mo. 385; Taylor v. Architectural Iron Co., 133 Mo. 349. (3) The answer of defendant does not plead the defenses of fraud or false swearing sought to be invoked by defendant, because no facts showing fraud, or falsity, are set forth, hence these issues are not in this case. A mere charge of fraud, or falsity, without specification how and without particulars, of the alleged false acts, amounts to nothing in pleading. Newman v. Trust Co., 189 Mo. 444; Barrie v. Railroad, 138 Mo. App. 645.

NORTONI, J.—This is a suit on a policy of fire insurance. Plaintiff recovered and defendant prosecutes the appeal. The policy sued upon is in the amount of $2000 on a stock of general merchandise owned by the insured, M. B. Caraway, and $350 on a frame store building in which he owned a one-half interest. The building and stock were situate at Brookeland in Texas, where Caraway conducted a general store, and were totally consumed by fire. Besides the policy in suit, Caraway carried other insurance on the stock to the extent of $3000, or a total insurance on merchandise of $5000. At the time of the fire, the insured was indebted to a number of wholesale houses and others and therefore assigned this and other policies to plaintiff as trustee for his creditors, and the suit is prosecuted by plaintiff as such trustee for the benefit of the creditors of the insured, Caraway.

Though it is set forth in several different forms in the answer, the defense relied upon is, in substance, that the insured, Caraway, conspiring and co-operat-

ing with one Burton to defraud the insurance companies, removed the greater portion of the stock of merchandise from his store at Brookeland to that of Burton, at Carthage, prior to the fire; but the jury found the fact to the contrary.

A few days after the fire occurred, one Slaton, adjuster for defendant and all other companies interested, went to Brookeland and devoted a portion of two days to investigating the loss, but did not settle it for the reason that Caraway, the insured, was absent from home. The adjuster notified Caraway to produce his books, papers, etc., and meet him at a later date at Dallas with a view to a settlement for all of the companies. In obedience to this request, Caraway, in company with Burton, a merchant of Carthage, subsequently charged as his co-conspirator, repaired to Dallas and went over the matter of the fire and the extent of the loss with Slaton, the adjuster, in his office. At this meeting, Caraway produced his books, bills and invoices and after the adjuster had devoted several hours to looking through the same, he submitted a proposition to the effect that the companies, including defendant, would pay the full amount of the several policies on merchandise, provided Caraway would surrender his claim against the present defendant for the $350 insurance on the building. It appeared that Caraway owned only one-half interest in the building and this fact had not been communicated to the company when the policy was issued. Defendant's policy stipulated that unless the insured was the sole and unconditional owner, the item of insurance should be void. Caraway took this proposition under advisement and returned home. A few days later, Burton wrote the adjuster that Caraway had learned he could not collect the $350 on the building and had therefore concluded to forego the same and accept the proposition so made on behalf of all of the companies for payment of the full amount insured on merchandise.

The adjuster's proposition having been thus accepted, he prepared proofs of loss for defendant and the other companies and mailed them to Burton for execution by Caraway.  Caraway executed the several proofs of loss and mailed them to the adjuster; who transmitted them to the companies and wrote Caraway that the amounts would be paid by the companies promptly at the expiration of sixty days in accord with the time specified in the policies.  Defendant and all other companies retained the proofs so made, but at the expiration of sixty days declined to pay the loss for the reason, it is said, they had subsequently procured information to the effect that Caraway and Burton had confederated and conspired to defraud them by removing the goods from Caraway's store at Brookeland to that of Burton at Carthage, prior to the fire.  In the meantime, the policy in suit had been assigned to plaintiff as trustee for the creditors of Caraway and upon defendant's refusal to pay it this suit was instituted thereon.

At the trial, the facts above stated were shown, and defendant's liability, except for the fraud set forth in the answer, was either proved or admitted, while it was admitted by plaintiff that defendant had duly tendered a return of the premium paid on the policy.  To sustain its several affirmative defenses, defendant introduced evidence tending to prove that Caraway was a young man without means who had opened a store at Brookeland in August before the fire, which occurred on October 19, 1906, and that Burton had aided him to purchase goods by recommending him to the wholesale houses, etc.  It seems that Caraway and Burton were old friends, related by marriage and had been intimate for many years.  Burton was the elder and formerly had been associated with Caraway's father in business.  Caraway had started a store at a small town in Texas not long before his venture at Brookeland, and upon it appearing that

he could not succeed, closed it and invoiced some-
thing over $2500 of his stock to Burton, who placed it
in his store, under an agreement that when Caraway
opened a new store, he would invoice a similar amount
of like goods to him from the stock then on hand.
For a few months after this, Caraway clerked for
Burton at Carthage and in August, 1906, opened his
store at Brookeland. In this new store, Caraway ac-
cumulated a stock of merchandise said to be worth
about $9000. Something over $2500 of this was in-
voiced to him by Burton from his store, in lieu of that
which Caraway had delivered to Burton the year be-
fore, and the remainder was purchased from whole-
sale houses on credit, through Burton's recommend-
ing Caraway to them. Caraway sold a little over
$500 worth of goods after opening his store at Brooke-
land in August and before it was consumed by fire
during the night of October 19th. There was no at-
tempt to show by direct proof that Caraway intention-
ally communicated fire to his store, but the evidence
suggests that he was careless of a fire in a stove, which
he had lighted for the purpose of heating water, to
the end of taking a bath. He was not present at the
time the fire originated, but there are facts and cir-
cumstances in proof, which, if believed, would support
an inference that the insured was at least not averse
to a fire. On the issue of fraud defendant introduced
one Mills, a teamster, who testified that he had been
employed by Burton to haul goods from Caraway's
store at Brookeland, a distance of ninety miles, over-
land, to his, Burton's, store at Carthage, and that in
pursuance of this employment he had hauled eight
wagon-loads of such goods and delivered them to Bur-
ton during the two months prior to the fire. The wit-
ness said he and Caraway loaded the goods in his
wagon under cover of night at Brookeland; that he
consumed about three days on the road in hauling
each load and delivered them to Burton at his store

in Carthage at night time as well.  Numerous farmers along the road gave testimony to the effect that they saw Mills hauling goods between the two towns.  Some noticed him driving toward Brookeland and others saw him driving toward Carthage.  Much of this testimony is vague and uncertain and goes to the effect only that Mills was seen to pass along the road and from the ''cluck'' of the wagon it appeared to be loaded.  But some of these witnesses say they noticed on one or two occasions boxes and trunks in his wagon which looked as though they contained merchandise.  It was shown, too, that Burton indorsed a note for Mills at the bank to enable him to procure means with which to purchase the team and wagon employed in hauling the goods, and this note Burton subsequently paid.  Another witness says he saw a wagon being unloaded from the alley in the rear into Burton's store about this time during the night.

For plaintiff, it is shown by the testimony of Caraway and Burton and others that the only goods Mills hauled were three loads from Burton's store at Carthage to Caraway's at Brookeland and that Burton assisted Mills in purchasing the wagon and team for this purpose.  These goods are said to be those which Burton furnished Caraway in lieu of those invoiced to him the year before and amounted to something over $2500.  Furthermore, the salesman and saleslady employed in Burton's store say that Mills or no one else hauled or delivered any goods to Burton's store during nights from any place, and a number of the citizens of Brookeland, who were patrons of Caraway's store, say that his stock of goods was not diminished during this period but on the contrary was constantly being increased by the receipt of new goods.  The witness, Mills, is shown to have made contradictory statements touching the matter, and admitted on the witness stand to have made a sworn statement, though not in evidence, contrary to his testimony given

at the trial. Mills appears to be a "harum scarum" drinking fellow who drove a team at the logging camps for a livelihood, and though his testimony may be true, his conduct and demeanor throughout were not calculated to inspire the confidence of the jury.

It is argued the verdict should be set aside for the reason it is contrary to the overwhelming weight of the evidence and suggests passion and prejudice on the part of the jury, but we are not inclined to accede to this view. This argument proceeds as though the several farmers along the road corroborated Mills throughout, when they did not. There can be no doubt that the testimony referred to supported him to the extent that he was seen hauling several loads, which seemed to be merchandise in boxes and trunks, but no one knows from whence these loads came or whither they went, and, indeed, no one could say positively that the wagon was loaded with merchandise. Then, too, it may be these loads of goods were those en route from Burton's store to Caraway's, as is suggested by the proof for plaintiff. It is true some of the witnesses say Mills' wagon was loaded when seen going north towards Carthage, but when the uncertainty of memory and the doubtful faculty of persons not interested for accurate observation are considered, we believe this matter to be one peculiarly for the jury. It is true there is much of this testimony and it is worthy of candid consideration, but, as before said, it is all more or less indefinite and vague in that it omits to show positively that Mills was hauling merchandise from Caraway's store to Burton's. On this, the vital question, Mills' word stands alone against not only that of Caraway and Burton but Burton's salesman and saleslady as well; for, obviously, no such amount of new goods could have come into Burton's store without his employees, who are shown to have been entirely familiar with the stock, ascertaining the fact.

159 App.—45

Moreover, in this connection, the evidence of a number of Caraway's patrons at Brookeland is to be considered. They saw no indication in his store suggesting the removal of goods and if the evidence for defendant is believed, it would seem that from $5000 to $8000 in goods were carried away within a couple of months before the fire. Such a removal from a $9000 stock would, no doubt, attract the attention of those who frequented the store. Besides all of this, the witness, Mills, is shown to have made contradictory statements concerning the hauling and it is admitted one of these was made under oath. As before said, his conduct and demeanor are not calculated to inspire confidence and we are certainly not inclined to say the proof for defendant is so overwhelming as to suggest passion or prejudice on the part of the jury. When all considered together, the proof for defendant, though persuasive, indeed, is abundantly counterbalanced by that for plaintiff. And no one can doubt that the credibility of the witnesses and the weight and value to be accorded to their testimony are matters for the consideration of the jury.

The policy stipulates, in substance, the insurance should be void unless the insured kept a full, true and complete set of books and invoices showing the amount of goods received and those disposed of in any manner together with all sales for either cash or credit, etc. Besides the fraud and conspiracy above referred to, which is relied upon in a general way in defense, the answer set forth this covenant in respect to books and invoices and pleaded its breach and the consequent forfeiture of the insurance for the reason the insured had omitted to show, in his books, the eight wagon-loads of goods alleged to have been delivered to Burton as above stated. Touching this defense and the waiver of the terms of the policy respecting it, the court instructed for plaintiff as follows:

"Even though you may believe from the evidence that Caraway did not take or keep such an inventory or such a set of books, as the policy called for, yet, if you find from the evidence that W. D. Slaton was the adjuster of the defendant who was employed by the defendant insurance company to look into, examine and adjust this loss, and that he had Caraway meet him in Dallas for the purpose of examining the facts about the fire, and there he and Caraway went over the facts of his loss, if any he suffered by said fire, and that Caraway then gave Slaton such books, bills and inventories as he in fact did keep and did have relating to this stock of goods and his loss, if any, which he had suffered by said fire, and that Slaton did not object to same, but told Caraway that they were all right, and that if he would throw off the $350 item on the house, he, Caraway, should go home and that he, Slaton, would make out and send him such proofs of loss as the company would desire, and that he, Caraway, should fill them up, and sign and swear to the same and return them to him, Slaton; and thereafter Slaton did send Caraway such blank proofs to be executed and returned, and that Caraway did comply with Slaton's request in these particulars, and did throw off the $350 insurance on the house, and did return the signed and executed proofs of loss to Slaton, and that the company has ever since kept the proofs so furnished Slaton by Caraway, then you may find that the company waived its right to declare the policy forfeited for these reasons, and upon this issue, you may find in favor of the plaintiff."

It is argued the judgment should be reversed because this instruction is misleading in that it assumes Caraway and Slaton, the adjuster, "went over all of the facts" touching the loss and that it unduly emphasizes the matter of Caraway's foregoing his claim to the $350 for the item of insurance on the building. The latter suggestion we regard as not sufficiently material

to merit further consideration and therefore dismiss
it. As to the first argument, it should be said that
it is no doubt true, as a general proposition, the taking
of the proofs of loss and promising to pay operates a
waiver of the breach of the covenant pertaining to the
keeping of accurate books and inventories. Such is
the undoubted course of decision. [See Dolan v. Ins.
Co., 88 Mo. App. 666; Cooley's Briefs on Insurance,
p. 2733.] But though such be the rule of decision on
relevant facts, we believe the principle without influ-
ence here for the reason there can be no waiver when
it appears the adjuster is wholly without knowledge
of the facts in respect of which the waiver is asserted.
A waiver we understand to be the intentional aban-
donment of a known right, and in every instance where
it is invoked there should be some proof tending to
show the party was possessed of knowledge in respect
of the matter about which the waiver is asserted, and
acted advisedly. [Francis v. Supreme Lodge A. O. U.
W., 150 Mo. App. 347, 130 S. W. 500.] We do not
interpret the instruction as assuming that Caraway
and Slaton went over all of the facts pertaining to the
loss, for instead of assuming such it submits it to the
jury to be found from the evidence, and the error is
in so submitting the matter when there is not even a
suggestion in the proof that Slaton had any informa-
tion whatever touching the fact, if it be a fact, that
goods were removed from the Caraway store to that
of Burton and not shown on the books. The books
and invoices, when examined by Slaton, seemed to be
complete on their face, and it was not until a month
thereafter that information was received suggesting
Caraway had shipped goods away which were not
shown in the books.

But though there be error in this instruction on
the peculiar facts of the case, we believe the judg-
ment should not be reversed on account of it, for the
reason, according to the view of the jury, no goods

were removed from the store and the books and in-
voices exhibited to Slaton were therefore true and
correct. The whole argument predicates on the mat-
ter of Mills' hauling goods from Caraway's store to
Burton's, for the incorrectness of the books is alleged
to be in their failure to disclose the amount of such
goods removed from the stock. If no goods were re-
moved, then Caraway's books exhibited the true state
of affairs to Slaton, and by taking proofs of loss, after
having examined them, he waived any breach of the
book and inventory clause which was open and ob-
vious to him from the face of such books themselves.
In other words, if the books were true, then no breach
of the covenant respecting them occurred and there-
fore nothing to waive obtained in the case. Six in-
structions were given for defendant and five of them
placed the alleged matter of removing goods from
Caraway's store to Burton's before the jury from dif-
ferent view points, with the positive direction that, if
the fact be so found, then no recovery could be had;
and the remaining one, defendant's No. 5, told the jury
there was no waiver of the alleged breach of the book
and inventory clause if there had been a removal of
goods and it was unknown to Slaton at the time the
proofs of loss were made. The case concedes Slaton
had no knowledge of the alleged removal of goods at
the time the proof of loss was made and this instruc-
tion, therefore, amounted to a positive direction that
no waiver of the book and inventory clause could be
had on the facts, if goods were removed from Cara-
way's store. This instruction is as follows: ''The
court instructs the jury that even though they may
find from the evidence that W. D. Slaton was the
adjuster for the defendant with Caraway of the loss
consequent upon the burning of Caraway's store at
Brookeland, and that he in that capacity adjusted the
loss on the basis of a greater amount than the total of
the insurance written upon the merchandise in said

store, and adjusted the loss of the defendant on said merchandise $2000 under the policy in suit, and told the said Caraway or his represenatives that the said policy would be paid, to-wit, $2000, covering merchandise in said store; yet, if you further believe from the evidence that there had been at that time a removal of goods from said store to the store of Burton, as mentioned in instructions given, Nos. 1 and 2, or a breach of conditions in said policy, as set forth in instruction No. 4, given, and that these things were unknown to the said Slaton; then his adjustment of the loss, or his promise in behalf of the company to pay same, constituted no waiver by the company in this action to set up the defenses pleaded and referred to in the said instructions.'' That all the instructions given should be read and interpreted together is undoubtedly true, and the statute (Sec. 2082, R. S. 1909), commands that no judgment shall be reversed unless the court believes that error intervened at the trial materially affecting the merits against the appellant. From what has been said, it is obvious that we cannot say the error mentioned materially affected the merits to the detriment of defendant, for the jury found as a fact under all of the instructions that no goods whatever were removed from Caraway's store and his books were therefore accurate and true, and, in this view, the matter of waiver is immaterial; for if Caraway's books were true, then the covenant in the policy requiring such was fully complied with and no breach in respect of which the waiver is asserted was shown.

The other arguments put forward for a reversal of the judgment have all been considered, but we do not regard them sufficient to merit discussion in the opinion and they will be overruled, without elaboration. The judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Caulfield, J.,* concur.